70094. MARKS v. THE STATE.

(331 SE2d 900)

BIRDSONG, Presiding Judge.

The defendant, Howard Marks, was indicted for and convicted of a violation of the Georgia Controlled Substances Act, by unlawfully possessing cocaine.

On the afternoon of March 15, 1984, at approximately 4:30 p.m., Michael Martin was working at the counter of Airborne Express in Miami, Florida. Airborne Express is an overnight package delivery service. A man, subsequently identified as Dan Diamond, entered the Airborne office through the employees' entrance carrying two packages. He was wearing cut-off pants and flip-flop shoes. Martin considered this unusual attire because 99 percent of Airborne's customers are businessmen. Diamond was "rather nervous and giddy about this shipment. He was constantly reminding [the clerk] what or describing what he thought was in the package or what he claimed was in the package." The packages were "unprofessionally wrapped" in brown paper and hand labeled rather than using a shipping label. One package was addressed to Hartford, Connecticut, and one was addressed to the defendant in Macon, Georgia.

Diamond paid the shipment charges in cash. Most customers have an account or are billed. Diamond told the Airborne clerk this was an electronic component his friend needed. While Diamond filled out the shipping document, Martin went back to his supervisor, Tom Lamp'l, and told him: "I think we have another one." He was referring to the fact that on the preceding day Airborne personnel had opened a suspicious looking package and it contained illegal drugs. The Federal Drug Enforcement Agency (DEA) was notified. About one-half hour before Diamond arrived, another individual in "cut-offs" and "flip flops" had mailed a similar package and when it was opened, a substance thought to be cocaine was found. Airborne notified the DEA and Agent Barnes responded and was then in Lamp'l's office filling out forms to take custody of the package. Lamp'l explained that Airborne's corporate policy was contained in the "Air-

borne Express Service Guide" which stated: "Airborne reserves the right to inspect all shipments tendered for transportation by Airborne. This includes opening shipments." This policy was for the safety of Airborne personnel to prevent shipment of bombs and explosives.

Lamp'l testified that the Federal Aviation Agency (FAA) had sent a "profile" to their company and Airborne had made it a company policy and published a memo that warned employees to be on the lookout for "suspicious" packages. Included within the memo were instructions to look closely at anyone shipping packages who were "not professional looking, wanting to pay in cash ahead of time . . . not giving a business address. . . ." The basis for the FAA memo was soley for security and did not mention drugs. This Airborne Service Guide was given to all customers and to Airborne employees. While Lamp'l was talking to Agent Barnes, he saw Diamond enter the office and he observed the way he was dressed. He told Barnes: "[T]ake that man who just came in the door for example, he's unkempt, he's not very well dressed, he's filling an air-bill for two shipments which are wrapped in brown paper . . . there's a typical example of the customer that's very suspicious in nature. The customer is acting very nervously." Lamp'l went outside the office to get the tag number of the car which Diamond may have been driving and took down the number of the only car which was suspicious, a Mercedes. It was later found to belong to an Airborne employee.

After Diamond left, Martin carried the two packages to Lamp'l's office and, motioning toward Barnes, asked: "Do you want to open this because I think its . . ." and Barnes declined, stating: "I can't be involved in this." Lamp'l took the packages into his supervisor's office and opened them. Lamp'l and Barnes testified that Barnes stayed in the outer office when he opened the first package. Martin also testified that Barnes stayed in the outer office, but admitted on cross-examination that earlier he had told defendant's counsel that Barnes was present when both packages were opened. After the first package was found to contain a white crystalline powder, Barnes was invited to look at the contents and he went outside to apprehend Diamond or attempt to get a tag number. While he was gone, the second package was opened and it also contained a white powdery sustance. Barnes field tested the powder in his office, and it was positive for cocaine.

The Macon package was forwarded to the Bibb County Sheriff's Office by the DEA for delivery to the addressee: Howard Marks. Officer Mathern called Marks' listed phone number, and the address in the phone book corresponded to the address on the package. The person answering the phone stated he was Marks' roommate. Mathern recognized the voice from subsequently talking to Marks as that of the defendant. Mathern told the person that he had a package for Mr.

Marks. The other person asked: "Where has it been?" Mathern told him it was mistakenly sent to Seattle and had been re-routed to Atlanta. Mathern described the other person's voice as "very nervous and there was a shaking in [his] voice." Mathern was asked when the package had been mailed and he told him on March 15th. The person called said he did not know when Marks would be home. Later that afternoon, Mathren asked another officer to call Marks' number. Marks answered the phone and said he would be at home to accept the package. The officers went to the address listed on the package and saw Marks outside his apartment by his car. One officer advised Marks the reason they were delivering the package personally was they wanted him to know what had happened to it. Marks asked where he was to sign and did sign for the package. His hands were visibly shaking and he appeared anxious and nervous. After Marks took possession of the package, he was arrested. The defendant brings this appeal following his conviction. *Held*:

1. Defendant contends the trial court erred in failing to suppress the evidence seized by the DEA agent because of Agent Barnes' participation in the search of the package in Airborne's office, and because Lamp'l "relied on the FAA profile for suspicious packages when determining whether to search the Macon package." Defendant argues that Barnes' involvement in the search, and the FAA directive were sufficient governmental participation to invoke the Fourth and Fourteenth Amendments on behalf of Marks. We do not agree.

Although not articulated as such, it appears that defendant is asserting a revival, in an amended form, of the condemned "Silver Platter Doctrine." Stated another way, he contends that rather than government agents requesting state officials to turn over illegally received evidence, now the government is requesting private individuals, to whom the Fourth Amendment does not apply, to turn over incriminating evidence against a defendant.

The United States Supreme Court, in *Weeks v. United States*, 232 U. S. 383 (34 SC 341, 58 LE 652), first enunciated the exclusionary rule, but also found that it applied to federal officials and not to state law enforcement officials. Thereafter, the court set forth the criteria that the Fourth Amendment provided protection against unlawful searches and seizures only from governmental action, and not against acts of private individuals. *Burdeau v. McDowell*, 256 U. S. 465, 475 (41 SC 574, 65 LE 1048). Hence, it was concluded in *Lustig v. United States*, 338 U. S. 74, 78-79 (69 SC 1372, 93 LE 1819) that "a search is a search by a federal official if he had a hand in it; it is not a search by a federal official if evidence secured by state authorities is turned over to the federal authorities on a silver platter." The court began its retreat from the silver platter doctrine in *Byars v. United States*, 273 U. S. 28, 33 (47 SC 248, 71 LE 520), when they

asserted that "[w]e do not question the right of the federal government to avail itself of evidence improperly seized by the state officers operating entirely upon their own account. But the rule is otherwise when the federal government itself, through its agents acting as such, participates in the wrongful search and seizure." Later, in *Rochin v. California*, 342 U. S. 165, 172 (72 SC 205, 96 LE 183), the court found that the means used by a state to procure evidence could be sufficiently offensive to the concept of ordered liberty as to make the admission of the evidence in a federal court a violation of the Due Process Clause of the Fourteenth Amendment. Finally, *Elkins v. United States*, 364 U. S. 206, 223 (80 SC 1437, 4 LE2d 1669), states the present rule that "evidence obtained by state officers during a search which, if conducted by federal officers would have violated the defendant's immunity from unreasonable searches and seizures under the Fourth Amendment, is inadmissible over the defendant's timely objection in a federal criminal trial." The last step was taken in *Mapp v. Ohio*, 367 U. S. 643, 655 (81 SC 1684, 6 LE2d 1081), when the Fourth Amendment's right of privacy was made applicable to the states.

The silver platter cases are persuasive in that they deal with what action by federal officials would convert state action into federal action in a search and seizure situation. And, in the instant case, we have the allegation that the actions of the federal officials were sufficient to make the private person's search and seizure that of governmental action, thus invoking the exclusionary rule.

"The test . . . is whether [the private individual], in light of all the circumstances of the case, must be regarded as having acted as an 'instrument' or agent of the [government] when [he] produced [the evidence]." *Coolidge v. New Hampshire*, 403 U. S. 443, 487 (91 SC 2022, 29 LE2d 564). The Federal Circuit Court of Appeals for the District of Columbia had before them a case in which a party shipped a package from San Francisco to Washington, D. C. via United Airlines. The suspicions of United's clerk were aroused, and he and his supervisor opened the package and found 30 reels of pornographic film. The FBI was notified and a controlled delivery was made. The court, citing Rule 24 of Civil Aeronautics Board Regulation 96, which provides that all shipments by the airlines are subject to inspection by the carrier, found that the airline's inspection privilege existed independently of the DAB regulation. *United States v. Pryba*, 502 F2d 391 (DC Cir. 1974). "It is rooted in the rule of the common law that common carriers have the right to decline shipment of packages proferred in circumstances indicating contents of a suspicious, indeed of a possible dangerous nature." Id. p. 399. They held that where the search is made on the carrier's own initiative, for its own purposes, Fourth Amendment protection did not apply to private conduct de-

void of government participation. Id. p. 398.

The Supreme Court has consistently followed this same policy, i.e., that the protection afforded by the Fourth Amendment proscribes only governmental action and is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the government or with the participation of a government official. *United States v. Jacobsen*, __ U. S. __ (104 SC __, 80 LE2d 85, 94). In *Jacobsen*, an employee of a private freight carrier observed a white powdery substance originally concealed within a package which had been damaged by the carrier. The employee examined and opened the package and notified the federal agency. A federal agent field tested the white powder and determined it was cocaine. The Supreme Court found that the employee's purpose in opening and examining the package pursuant to a written company policy was private action, and held that whether the invasion of the package by the private party was accidental or deliberate, the Fourth Amendment did not apply because of the private character of the search. Id. p. 95. The additional invasion of the privacy of the defendant's package by the government agent is permissible as long as it does not exceed the scope of the private search, unless the agent had the right to make an independent search. Id. p. 96. Defendant's right of privacy was not infringed when the federal agent re-examined the contents of a package already opened by a private individual. Id. p. 98. The removal of a portion of the powder was a seizure but was not unreasonable under the circumstances. Id. pp. 99-100. It was constitutionally reasonable for a law enforcement officer to seize the package without a warrant, based on probable cause he had to believe the package contained contraband. Id. p. 99.

In the instant case, the trial court found that there was no evidence this package was opened through the intervention or direction of the DEA agent, and the packages were opened by Airborne's personnel pursuant to their own company policy, without any direction, either express or implied on the part of the DEA. It was purely coincidental that the DEA agent was in Airborne's office at the time these packages were left for shipment. The trial court's finding on questions of fact and credibility at a suppression hearing must be accepted unless clearly erroneous. *Woodruff v. State*, 233 Ga. 840, 844 (213 SE2d 689). The trial court's findings are not clearly erroneous, but are fully supported by the evidence. The court did not err in denying defendant's motion to suppress.

2. In addition to the evidence cited above, records of Southern Bell were introduced to show that telephone calls were made from the number listed to defendant Marks to the telephone number listed to Dan Diamond in West Miami, Florida, in 1983 on August 29, September 2, and November 3, 14 and 17. Calls were made to Diamond's

number in 1984 on February 21 and 26, March 5, 9, 10, 11, and 15. On March 16, the day following the expected overnight delivery of the Airborne package shipped on March 15, four calls were placed from defendant's phone to Dan Diamond's phone. In response to a subpoena, an officer of the Macon C&S Bank produced a check written on the account of defendant, dated January 2, 1984, made payable to Danny Diamond in the amount of $250. The check had been endorsed with the signature of Danny Diamond. There was sufficient evidence to enable any rational trier of fact to find the existence of the offense charged beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560); *Stinson v. State*, 244 Ga. 219 (4) (259 SE2d 471).

3. The trial court did not err in refusing to give a charge on two equal theories, one of guilt and one consistent with innocence. See *Booker v. State*, 156 Ga. App. 40 (4) (274 SE2d 84), remanded 247 Ga. 74 (274 SE2d 334), affirmed 157 Ga. App. 872 (278 SE2d 745), for full discussion of rejection of this charge.

*Judgment affirmed. Carley and Sognier, JJ., concur.*

DECIDED APRIL 22, 1985 —
REHEARING DENIED MAY 7, 1985 —

*G. F. Peterman III, Bobby Lee Cook, James F. Wyatt III*, for appellant.

*Willis B. Sparks, District Attorney, Graham A. Thorpe, Thomas J. Matthews, Assistant District Attorneys*, for appellee.