# 73466. MORTON v. THE STATE.
## (353 SE2d 852)

Pope, Judge.

David Franklin Morton brings this appeal from his conviction of two counts of armed robbery and one count of kidnapping with bodily injury. He was tried by jury in a joint trial with co-defendant Deborah Elaine Morton. The victim worked as a cashier at a Spur station located in an isolated area of Gwinnett County. After closing the station late at night, she was walking to her car when appellant suddenly grabbed and hit her. She screamed as appellant forced her into her car and cut her on the forehead with a knife. He held the knife at her throat, threatening, "Don't scream any more, bitch, or I will cut your throat." Then the co-defendant joined them in the car. Although the victim was bleeding profusely, appellant forced her to unlock the Spur station in order to obtain money from the store. Once again, he threatened to kill her if she attempted to alert the police. After obtaining money, checks, beer, and cigarettes from the station, appellant and the co-defendant forced the victim to drive them towards Jacksonville, Florida. The victim's wound continued to bleed, and appellant gave her his undershirt to absorb the blood. She drove until the blood from the wound impeded her ability to see and drive properly. Later, they stopped at a Holiday Inn where co-defendant secured a room in a fictitious name and gave the motel clerk a fictitious license tag for the car. In the room the victim took a shower without removing her clothes in an attempt to wash the blood from her face, hair and clothes. The towel with which she dried herself was bloodied in the process. Appellant and the co-defendant counted the money, and after ascertaining that the checks taken from the Spur station could not be cashed, appellant directed the victim to burn them in the trash can. Smoke from the burning checks triggered the fire alarm in the room, whereupon appellant violently dismantled it.

Subsequently, appellant decided that the three would leave the motel that night. They continued their journey, leaving the bloodied undershirt and towels in the room. Appellant drove until stopped by the State Patrol. At that time, he directed the victim to change places with him and to represent to the officer that she was driving. The officer noticed that appellant changed places with the victim and indicated that he wanted to talk to appellant. At this point, the victim told the officer that she had been robbed and kidnapped.

Both appellant and the co-defendant submitted statements to the police at the time of arrest. Although the co-defendant did not testify at trial, her statement implicating appellant was tendered into evidence by the prosecution over the objection of defense counsel. The statements of appellant and co-defendant were substantially the same; however, the statement of appellant did not contain an admis-

sion that he utilized a knife in the abduction of the victim, or that he threatened to kill the victim, or that he premeditated the robbery of the station. The statement of co-defendant did indicate that appellant premeditated the robbery, and that appellant threatened to kill the victim. At the close of evidence at trial, the court instructed the jury, inter alia, that "any statement made by one of the Defendants in this case . . . is admissible only against the person who made any such statement. . . ."

1. Appellant contends that he was deprived of his right of cross-examination secured by the confrontation clause of the Sixth Amendment by the introduction into evidence of the statement made to the police by the co-defendant and the failure of the co-defendant to testify at trial. In *Bruton v. United States*, 391 U. S. 123 (88 SC 1620, 20 LE2d 476) (1968), the United States Supreme Court held that the admission into evidence at a joint trial of a co-defendant's extrajudicial confession implicating the defendant violated the defendant's Sixth Amendment right of cross-examination, despite instructions to the jury to disregard the co-defendant's statement in determining the defendant's guilt or innocence. In *Gamarra v. State*, 142 Ga. App. 196 (2) (235 SE2d 652) (1977), this court held that there is no *Bruton* violation when the testimony presented in the co-defendant's confession is supported by the complaining defendant's own confession. Finally, in *Harrington v. California*, 395 U. S. 250 (89 SC 1726, 23 LE2d 284) (1969), the United States Supreme Court indicated that if overwhelming evidence against a defendant exists apart from the statement of the co-defendant, then any violation of *Bruton* can be said to be harmless beyond a reasonable doubt. In *Harrington*, the defendant's statement, although not a confession, placed him at the scene of the crime. Further, there was overwhelming evidence against the defendant apart from the statements of his co-defendants.

In the case sub judice, the facts of both statements are interlocking. We find no abuse of discretion in the trial court's finding that appellant's statement was supportive of the co-defendant's statement. See *Gamarra*, supra. Nevertheless, the record reveals overwhelming evidence apart from the statement of the co-defendant on which the jury could have found appellant guilty beyond a reasonable doubt. The victim's testimony included the most damaging facts contained in the co-defendant's statement, thereby rendering the facts of the co-defendant's statement merely cumulative. Further, the testimony of the victim was buttressed by tangible evidence, viz., the bloodied towel and clothing, as well as by the testimony of the guard and other witnesses. In view of the overwhelming evidence against appellant, existing apart from the co-defendant's statement, there is no reasonable possibility that the statement contributed to his conviction. Accord *Butler v. State*, 156 Ga. App. 89 (2) (274 SE2d 104) (1980).

2. Appellant argues that the trial court committed reversible error by denying his motion to suppress evidence obtained without a warrant from the motel room. The record reveals that appellant, the co-defendant, and the victim drove into the Holiday Inn parking lot at approximately 3:00 a.m. in the morning. The night security guard testified that he became suspicious due to the unusual time of arrival, the appearance of the victim, and the fact that the car was old and "just didn't look the type that usually stays at the Holiday Inn." After the three checked into a room, the guard examined the registration card completed by the co-defendant. He learned that the co-defendant had supplied false information on the card concerning the number of persons staying in the room and the type of automobile driven. He also noticed that appellant parked the car in a manner which suggested that he wished to hide the car. Approximately forty-five minutes after the three entered the motel room, the guard observed them leave and drive south on the interstate highway. No establishments existed along the southern part of the interstate; therefore, the guard surmised that the three had left permanently. He entered the appellant's room where he noticed the key to the room, the bloodied undershirt, a bloodied towel, blood on the bottom of the bathtub, remains of burned articles in a trash can, and the dismantled smoke alarm. The guard called the Georgia State Patrol to investigate. A short time later, the local police stopped on a routine call, whereupon the guard explained what he had observed. The police officer inspected the room, remarking that a crime had been committed. Subsequently, the registration clerk informed the guard and policeman that the State Patrol had stopped the automobile and discovered that the victim had been kidnapped. The guard and police locked the motel room, which remained locked until the Georgia Bureau of Investigation arrived some four to five hours later. The GBI then seized the bloody towels, undershirt, fiber evidence, and other evidence.

The trial court did not abuse its discretion in finding that appellant vacated the motel room before governmental authorities were alerted. See *Buttrum v. State*, 249 Ga. 652 (293 SE2d 334) (1982); *Abel v. United States*, 362 U. S. 217, 241 (80 SC 683, 4 LE2d 668) (1960). Further, in light of all of the circumstances, the record does not support a finding that the security guard must be regarded as having acted as an agent of the state at the time he entered the room and alerted the State Patrol. Accord *Coolidge v. New Hampshire*, 403 U. S. 443, 487-90 (91 SC 2022, 29 LE2d 564) (1971). The guard entered the room on his own volition, clearly outside of the behest of any governmental agent. His actions were based solely on his own suspicions. Although the Fourth Amendment protects individuals from unreasonable searches and seizures conducted by governmental authority, its protections do not extend to private individuals who con-

duct even unreasonable searches and seizures. *Marks v. State*, 174 Ga. App. 711 (1) (331 SE2d 900) (1985). Based on these findings, we find no error in the trial court's denial of appellant's motion to suppress.

*Judgment affirmed. McMurray, P. J., and Carley, J., concur.*

DECIDED FEBRUARY 13, 1987.

*J. Stanley Rhymer*, for appellant.

*Thomas C. Lawler III, District Attorney, Thomas A. Devlin, Jr., Assistant District Attorney*, for appellee.

## 73498. SISSON v. THE STATE.
### (353 SE2d 836)

BIRDSONG, Chief Judge.

The appellant, Gregory Sisson, was indicted for and convicted of two counts of child molestation. The State offered in evidence the results of a polygraph examination of the appellant, including the opinion of the examiner and the charts upon which he based his opinion. The examiner was a detective for the City of Roswell and had been a polygraph examiner for two years. He had attended a school accredited by the State of Georgia which included a "minimum of 320 hours of classroom study," and then interned for six months under a person approved by the State Board of Polygraph Examiners. In his opinion, the appellant "was not being truthful" in giving negative responses to questions regarding commission of the offenses charged.

Counsel for the appellant advised the court that his client had successfully passed two polygraph examinations before he consented for him to enter into a stipulation with the district attorney for "admission of the results of the polygraph examination in evidence" at his trial. Appellant's counsel offered the opinion testimony of two expert witnesses, based on the same charts used by the State's expert. The trial court refused to admit the testimony of the defense experts. That denial is enumerated as error. *Held*:

The stipulation entered into between the district attorney and the appellant provided, inter alia, that the State "consent[ed] for the admission of the results of the polygraph examination in evidence at the trial of Defendant on the above charges. . . ." Appellant's first witness, Dr. Leland Peacock, was Professor of Psychology at the University of Georgia and Chairman of the Psychology Department. His impressive credentials are too extensive to enumerate, but suffice it to say that in addition to his bachelor's, master's, and doctorate in Psy-

chology and Physiology, he has been involved in experimentation and research of the polygraph for more than 30 years. His use of a polygraph involved electronic instrumentation involving as many as sixteen different channels of physiological responses recorded upon the graph. The usual "field polygraph," commonly used by licensed polygraph examiners in Georgia, will have either three or four channels recording "respiration" (breathing), "galvonic skin response" (perspiration), and "cardiovascular" (heart rate and blood pressure) responses. Because of the lack of higher education of the average polygraph examiner, field polygraphs "have to be relatively easy to operate because of this lack of bio-medical electronics sophistication on the part of the user. [The machines] sometimes get carried around in the trunk of a patrol car or whatever, so they have to be pretty rugged and easy to operate . . . and what you lose when you build a rugged and easy to operate instrument . . . is sensitivity and accuracy."

The doctor was very definitive and convincing that "[t]here is no lie detector. . . . No, sir, it cannot detect lies. . . . It cannot detect deception. . . . What it can do is assess the degree of emotional arousal. Not the kind of emotion, not whether it's anger or deception or fear or hatred or disgust, but just general emotional arousal." The professor also delineated design defects of the "field polygraph" in the underinflated blood pressure cuff, and the so-called automatic adjustment to the galvonic skin response. The doctor cited the continuous study of one particular scientist in this field who devoted his life to determining whether a polygraph could distinguish between one type of emotion and another, such as fear and deception. "[A]t the end of his career, [he] came to the conclusion that you cannot identify a specific emotional state from a pattern of physiological changes" such as those measured by a polygraph. Of great interest was his testimony that only three controlled studies have been conducted on actual criminal cases in which the guilty person was known by a corroborated confession and the innocent parties were known by a corroborated confession. In those three controlled studies, in which the results were subjected to peer review, the maximum validity of the polygraph examination was 63 to 72 percentile. However, what he found so perplexing was not the lack of consistency or accuracy in determining the guilty party, but the fact that "from 38 to 55 percent of the innocent people were called guilty." It was his opinion that "an innocent person would be better off flipping a coin rather than relying on a polygraph test to establish his innocence." His opinion, based on the polygraph chart made by the State's expert, was that "you can't tell from this kind of record whether the subject is being deceptive or not." The trial court permitted appellant to perfect the record by letting the remaining expert state his opinion that "there's no deception

indicated on these charts."

The issue posited by these facts is whether it is reversible error for a trial court to refuse to permit appellant's expert witnesses to state their opinion to the jury as to what the State's polygraph charts indicate to them. Those charts were admitted in evidence by the State and three different experts arrived at three different conclusions as to what they showed. And, the trial court denied the jury the opportunity to hear appellant's expert's opinions of "the results of the polygraph examination," which was stipulated by the parties to be admissible.

Although our Supreme Court has stated "that doubt exists as to the complete reliability of lie detector tests, and [they] share at least a modicum of that doubt," they held "that upon an express stipulation of the parties that they shall be admissible, *the results of a lie detector test shall be admissible as evidence* for the jury to attach to them whatever probative value they may find them to have." (Emphasis supplied.) *State v. Chambers*, 240 Ga. 76, 77 (239 SE2d 324). "The results" of a lie detector test can be interpreted to be (1) the charts resulting from a graphing of the responses of the person tested, and/or (2) the opinion of an expert based on those charts. In the instant case, the trial court took the position that only the opinion of the operator of the polygraph was stipulated to be admissible and absent a stipulation of admissibility of the opinions of the appellant's experts, their testimony would not be admissible. We find this interpretation of *Chambers* and the written stipulation of the parties in this case, to be too restrictive.

It is the legislated intent of this state that "[t]he object of all legal investigation is the discovery of truth." OCGA § 24-1-2. And, the trial court is required to weigh in the balance the rights of the State and the defendant to obtain the truth. *Montgomery v. State*, 156 Ga. App. 448, 451 (275 SE2d 72). In *Sabel v. State*, 248 Ga. 10, 17-18 (282 SE2d 61), U. S. cert. den. 454 U. S. 973, our Supreme Court held that under "the due process requirements of *Patterson* [*v. State*, 238 Ga. 204 (232 SE2d 233)] and *Barnard* [*v. Henderson*, 514 F2d 74 (5th Cir. 1975)] . . . [a] criminal defendant on trial for his liberty is entitled on motion timely made to have an expert of his choosing, bound by appropriate safeguards imposed by the court, examine critical evidence whose nature is subject to varying expert opinion. . . . Whether the evidence is 'critical' is discussed in *White v. Maggio*, 556 F2d 1352, 1356 (5th Cir. 1977), and depends upon whether a specific or general request was made." Implicit within this holding is that such an expert may testify as to his opinion after examination of such "critical evidence."

In the case at the bar, a specific request was made to admit the testimony of appellant's experts as to the interpretation of "the re-

sults of a lie detector test," as stated in the stipulation. No one would doubt that "the results of a lie detector test" are subject to "varying opinion." Here three experts who examined the same charts arrived at three different opinions. We should emphasize that Dr. Peacock did not testify that the results of the test were "inconclusive." This court has held that such testimony would be without probative value even though the parties stipulated the results would be admissible. *Porterfield v. State*, 150 Ga. App. 303, 304 (257 SE2d 372). However, we have also held that where one test is "inconclusive" and a second test is deemed to be "deceptive" that the "inconclusive" test is admissible for impeachment, and as tending to show the polygraph is not infallible, and for the purpose of raising a reasonable doubt of defendant's guilt. *Lawson v. State*, 162 Ga. App. 579 (292 SE2d 421). Dr. Peacock's testimony can be interpreted only as his opinion that there is no such machine as a "lie detector," and such tests indicate only emotional responses, and the type of emotion is not identifiable by the physiological responses recorded by a polygraph. Thus, his opinion that "you can't tell from this kind of record whether the subject is being deceptive or not," is translatable to an opinion that the State's expert is wrong if he says this graph shows "deception."

We find such evidence to be "critical." The Supreme Court, in *Sabel*, supra, referenced *White* for guidance upon any issue of "criticality" of evidence. The court, in *White*, concluded that "critical evidence" is not synonymous with "dispositive," nor did it mean the "most important" evidence, "[i]nstead, it denotes . . . evidence having substantial probative force." 556 F2d at 1357. "Critical evidence, for purposes of the due process clause, is evidence that, when developed by skilled counsel and experts, could induce a reasonable doubt in the minds of enough jurors to avoid a conviction." Id. at 1357-1358. The State must have considered the results of this lie detector test as "having substantial probative force" and "critical" to their case, which essentially was a credibility issue, i.e., the credibility of the child who said the defendant committed the acts, versus the credibility of the appellant who denied commission of the acts. The testimony of the child may have been corroborated by evidence of an abrasion at the entrance to her vagina. But the doctor testified the abrasion could have been caused by a finger, either by the defendant or by the child herself. There was testimony that the child had been observed on two occasions, masturbating or playing with herself. We are unable to conclude, as a matter of law, that the testimony of appellant's expert that the polygraph results showed he was telling the truth when he denied commission of these offenses, could not have induced a reasonable doubt in at least one juror, to avoid a conviction.

The U. S. Supreme Court recognizes that when a state brings its

judicial power to bear upon a criminal defendant, "it must take steps to assure that the defendant has a fair opportunity to present his defense. . . . [F]undamental fairness entitles indigent defendants to an adequate opportunity to present their claims fairly within the adversary system. . . ." *Ake v. Oklahoma*, 470 U. S. 68 (106 SC 1087, 84 LE2d 53, 62). Although this appellant was not indigent, he should have the same opportunity to present his defense within the adversary system. Merely because a party stipulates to admissibility of testimony or evidence, does not deny that party the right to contest the accuracy of that testimony or evidence. For example, if a defendant stipulated that a State Crime Lab ballistics expert would testify that a bullet was fired from a particular weapon, such stipulation would not prevent the defendant from presenting his own expert's testimony that the same bullet was not fired from that weapon. Admissibility does not equate to incontestability. When the State made a polygraph examination relevant to a defendant's criminal culpability, as in this case, the testimony of an opposing expert may well be critical to defendant's ability to present an adequate defense. Hence, whether the defendant was telling the truth during the polygraph examination was therefore a critical issue, particularly in a one-on-one situation. And the polygraph results would be a "significant factor" in the resolution of this issue. As the court in *Barnard v. Henderson*, supra, observed, "the only means by which the defendant can defend against expert testimony by the State is to offer expert testimony of his own. . . . Fundamental fairness is violated when a criminal defendant on trial for his liberty is denied the opportunity to have an expert of his choosing . . . examine a piece of critical evidence whose nature is subject to varying expert opinion." Id. at 746. And, as stated before, the right to examine the evidence carries with it the concomitant right of the expert to testify as to his findings, for such right to examine would indeed be an empty gesture if the expert is not permitted to testify.

We conclude that the procedure authorized by *Sabel* is enhanced when a defendant's experts are permitted to examine and testify as to the accuracy of "the results of the polygraph examination." If the "results of the polygraph examination" administered by the State's expert are not subjected to this adversarial process, then the opinion of a State expert who routinely conducts tests for the State would be untouchable. "Even the most dedicated trial judges are bound to overlook meritorious cases without the benefit of an adversary presentation." *Bounds v. Smith*, 430 U. S. 817, 826 (97 SC 1491, 52 LE2d 72). We also find a salutory effect upon the procedure set forth in *Sabel*, by permitting the polygraph examiner's graphs to be subjected to the scrutiny of another expert. Not only is the accuracy of the expert's opinion as to a controversial test procedure reviewed, but the

State's expert will know that his conclusions will be subjected to peer review and he cannot cavalierly arrive at a conclusion of "deception" without an adequate foundation being depicted in the graphs.

Hence, unless the agreement between the parties expressly excludes examination of a defense expert, we find no reasons in logic or law which would forbid examination and testimony by a defendant's expert of the results of the polygraph examination. Although such result may not have been anticipated by the State in the instant case, the agreement did not forbid the result we reach. Since the "results of the polygraph examination" were stipulated to be admissible and that stipulation was honored, the defendant was entitled to present his expert's testimony on the graphs which the State admitted in evidence.

*Judgment reversed. Banke, P. J., and Sognier, J., concur.*

### ON MOTION FOR REHEARING.

The State, in a motion for rehearing, cites paragraph 6 of the agreement between it and the defendant as precluding examination of the polygraph examiner. We do not agree. Paragraph 6 of the agreement states: "Defendant and District Attorney hereby stipulate that results of said polygraph examination shall not be admissible as described above if said results are inconclusive and that sole responsibility for determining whether said polygraph examination results are conclusive or inconclusive shall be with the operator who administered the examination."

This portion of the agreement goes only to admissibility in evidence of the test results. The opinion stated that the results would be inadmissible if "inconclusive." *Porterfield,* supra. Because the only party who could determine whether the test results were inconclusive was the police operator, the opinion went to great lengths to show Dr. Peacock's professional opinion was not that the police examiner's test results were inconclusive, but that no polygraph can do anything but detect an emotional response, and no examiner can determine from the test results that the recorded emotional response was a showing of fear, disgust, hate, anger or deception.

We reaffirm our commitment, stated in the opinion, that justice is better served by an adversarial procedure wherein truth is ascertainable where experts of both sides have the opportunity of presenting their professional opinion on such a controversial issue.

DECIDED JANUARY 27, 1987 —
REHEARING DENIED FEBRUARY 16, 1987 —

*Roger Queen, District Attorney*, for appellee.