**FOURTH DIVISION**
**DILLARD, P. J.,**
**RICKMAN and BROWN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

***DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.***

**June 18, 2020**

# In the Court of Appeals of Georgia

A20A0258. SERDULA v. STATE.

DILLARD, Presiding Judge.

Following a bench trial, Paul Serdula appeals his convictions for 19 counts of unlawful surveillance, 11 counts of aggravated sodomy, two counts of sexual assault against a person in custody, one count of child molestation, and one count of aggravated child molestation. Specifically, Serdula argues that the trial court erred in (1) denying his motion to recuse the trial judge; (2) entering the State's proposed order as to the recusal motion without giving him an opportunity to respond; and (3) denying his motion to suppress certain evidence. Serdula also challenges the sufficiency of the evidence to support his aggravated-sodomy convictions and argues that his trial counsel was ineffective for failing to present a defense that he suffered

from a delusional compulsion, rendering him incompetent to stand trial.[1] For the reasons set forth *infra*, we affirm.

Viewing the evidence in the light most favorable to the trial court's verdict,[2] the record shows that on November 18, 2009, Kim Nimmons, a dental hygienist, noticed a device of some kind concealed in pipe covering under a sink in the employee's bathroom where she worked. The dental office reported Nimmons's discovery to police, and Officer A. K. Stallings responded to the scene, where he observed what appeared to be "[a] camera secreted under the [bathroom] sink." Detective Christopher Twiggs also responded to the scene, and ultimately, determined that the hidden device was a black Verizon LG cell phone positioned in a manner to record the toilet and cabinet areas of the bathroom.

---

[1] Although Serdula does not specifically challenge the sufficiency of the evidence to support all of his convictions, we conclude that the stipulated facts, along with the other evidence, were sufficient to support them. *See Jackson v. Virginia,* 443 U.S. 307, 317 (99 SCt 2781, 61 LEd2d 560) (1979). Indeed, Serdula admitted as much at trial.

[2] *See Wimberly v. State*, 302 Ga. 321, 323 (1) (806 SE2d 599) (2017) ("On appeal from a bench trial resulting in a criminal conviction, we view all evidence in the light most favorable to the trial court's verdict . . ." (punctuation omitted)). Notwithstanding our standard of review, Serdula and the State "stipulate[d] to the facts as announced in open court."

While Stallings and Twiggs were photographing the scene, Serdula appeared in the bathroom doorway and said, "that's my camera." In response, Stallings and Twiggs asked Serdula if he would speak to them about the incident, and he agreed to do so. And during the interview, Serdula told the officers that he placed his cell phone in the bathroom that morning because he believed "someone was stealing drugs from the facility and using the bathroom to hide the drugs on their person." Serdula claimed that he notified the dental office's management of his suspicions, but the office manager and the accounting manager later informed Twiggs that Serdula never made such a report to them. Following the interview, Serdula was arrested for unlawful surveillance.

On November 19, 2009, Twiggs obtained a search warrant for Serdula's residence, car, and cell phone. Then, later that day, another detective analyzed the phone's memory card and confirmed that Serdula recorded two of the dentist office's female employees using the toilet in the employee bathroom. And through the investigation that followed, police detectives discovered that Serdula was a nurse-anesthetist who recorded, molested, and sodomized 19 female patients—two of whom

were under the age of 16—while they were unconscious and awaiting medical procedures at a hospital or other medical office.[3]

Subsequently, on February 19, 2010, Serdula was charged with 15 counts of unlawful surveillance, nine counts of aggravated sodomy, one count of sexual assault against a person in custody, one count of child molestation, and one count of aggravated child molestation. A second indictment was issued on December 16, 2010, charging Serdula with four additional counts of unlawful surveillance, two additional counts of aggravated sodomy, and another count of sexual assault against a person in custody. On February 14, 2011, the State moved to join the indictments for trial, and the motion was granted.[4]

Prior to trial, Serdula filed a motion to recuse the trial judge, Judge Ruben Green, expressing concern that Green was an assistant district attorney during the

---

[3] Given the claims of error enumerated *supra*, a detailed recitation of how Serdula victimized each individual patient is unnecessary for the resolution of this appeal, especially when Serdula stipulated to those details. Nevertheless, some of the details of Serdula's conduct were the subject of a civil case in which one of his victims sued the dental practice. *See Goldstein, Garber & Salama, LLC v. J.B.*, 300 Ga. 840 (797 SE2d 87) (2017).

[4] Although there appears to be no written order in the record granting the State's motion to join the indictments for trial, it is clear from the record that the trial court granted one, and Serdula's convictions followed a single bench trial.

4

time when he was indicted and that Patrick Head, the district attorney, was instrumental in helping Green secure his current position as a Cobb County superior court judge. Serdula attached an affidavit that he executed, claiming that there was a "close relationship" between Green and Head and contended that this relationship "may greatly influence the perception the Court may have in [his] case." Then, during the hearing on his motion, Serdula requested an evidentiary hearing before a different judge to determine the closeness of Green's relationship with Head. But Green denied the request, and ultimately, denied the recusal motion, finding Serdula's affidavit legally insufficient. Serdula also filed a pretrial motion to suppress evidence retrieved from his cell phone, which included video recordings of his criminal acts, but this motion was also denied following a hearing.

Ultimately, Serdula pleaded not guilty to all counts, waived his right to a jury trial, and stipulated to the facts detailed *supra*.[5] Thereafter, Serdula proceeded to a bench trial at which he was convicted of all charged offenses. Serdula filed a motion for a new trial, but it was denied following a hearing.

---

[5] Serdula conceded that the stipulated facts were sufficient to convict him of the charged offenses, but he reserved the right to appeal the denial of his motion to suppress evidence and the motion to recuse Green.

Serdula appealed his convictions, arguing, *inter alia*, that the trial court erred in denying his motion to recuse Green. And in *Serdula v. State*,[6] we held that Green's impartiality might reasonably be questioned, and, at a minimum, Green should have referred the recusal motion to another judge for resolution.[7] Thus, we vacated Serdula's convictions and remanded the case to the trial court so that "the recusal motion as to . . . Green [could] be assigned to another judge for disposition . . . ."[8] In doing so, we instructed that

> [i]f the judge assigned to decide the recusal motion denies it, then . . . Green will continue to preside over the case, the judgments of conviction against Serdula should be re-entered, and he may file a new appeal enumerating the denial of the recusal motion as error along with the enumerations of trial error that he raised in this appeal. If the recusal motion is granted, however, Serdula's case must be reassigned, all proceedings and orders after the filing of the motion would be void as to Serdula, and his case would start over from that point before the new judge assigned to the case.[9]

---

[6] 344 Ga. App. 587 (812 SE2d 6) (2018) ("*Serdula I*").

[7] *Id.* at 591 (1).

[8] *Id* at 595 (4).

[9] *Id.* at 592 (1) (punctuation omitted).

6

Upon remand, Serdula's motion to recuse Green was assigned to a different judge. The new judge conducted a hearing on the motion, at which Head testified, and the motion was ultimately denied. The recusal order, in accordance with *Serdula I*, reentered Serdula's judgments of conviction. This appeal follows.

1. Serdula first argues that the trial court erred in denying his motion to recuse Green. We disagree.

This Court reviews a trial court's denial of a motion to recuse for abuse of discretion.[10] In doing so, our analysis necessarily begins with Rule 25.3 of the Uniform Superior Court Rules, which provides that

> When a judge is presented with a motion to recuse, or disqualify, accompanied by an affidavit, the judge shall temporarily cease to act upon the merits of the matter and shall immediately determine the timeliness of the motion and the legal sufficiency of the affidavit, and make a determination, assuming any of the facts alleged in the affidavit to be true, whether recusal would be warranted. If it is found that the motion is timely, the affidavit sufficient and that recusal would be authorized if some or all of the facts set forth in the affidavit are true, another judge shall be assigned to hear the motion to recuse. The allegations of the motion shall stand denied automatically. The trial judge shall not otherwise oppose the motion. In reviewing a motion to

---

[10] *See, e.g.*, *Vaughn v. State*, 247 Ga. App. 368, 370 (2) (543 SE2d 429) (2000).

recuse, the judge shall be guided by Canon 3 (E) of the Georgia Code of Judicial Conduct.[11]

And if all three criteria are met, another judge shall "be assigned to hear the motion to recuse."[12] Furthermore, whether the three threshold criteria have been met is "a question of law, which an appellate court reviews de novo."[13]

Also relevant to our analysis is former Canon 3 (E) (1) (a) and current Rule 2.11 of the Georgia Judicial Code of Conduct, which both provide that "[j]udges shall

---

[11] *See Post v. State*, 298 Ga. 241, 243 (1) (779 SE2d 624) (2015) (holding that, under Uniform Superior Court Rule 25.3, "when the trial judge assigned to a case is presented with a recusal motion and an accompanying affidavit, the judge shall temporarily cease to act upon the merits of the matter and determine immediately: (1) whether the motion is timely; (2) whether the affidavit is legally sufficient; and (3) whether the affidavit sets forth facts that, if proved, would warrant the assigned judge's recusal from the case."); *Henderson v. State*, 295 Ga. 333, 334 (759 SE2d 827) (2014) ("Once a motion to recuse is filed with the trial judge whose recusal is sought, that judge must make three threshold determinations regarding the legal sufficiency of the motion: whether it was timely filed; whether the affidavit made in support of it is legally sufficient; and whether, if some or all of the facts set forth in the affidavit are true, recusal would be authorized." (citation omitted)). Here, it is undisputed that Serdula's motion to recuse Green was timely.

[12] *Post*, 298 Ga. at 243 (1). *Cf. Lacy v. Lacy*, 320 Ga. App. 739, 751 (11) (740 SE2d 695) (2013) ("If all three of these conditions precedent are not met, the trial judge shall deny the motion on its face as insufficient, and there is no need for the trial judge to assign the motion to another judge to hear.").

[13] *Post*, 298 Ga. at 243 (1).

disqualify themselves in any proceeding in which their impartiality might reasonably

be questioned," including but not limited to instances when "the judge has a personal

bias or prejudice concerning a party or a party's lawyer . . . ."[14] And as to this judicial

canon and rule language, we have held that

> "[i]mpartiality might reasonably be questioned" means a reasonable
> perception, of lack of impartiality by the judge, held by a fair minded
> and impartial person based upon objective fact or reasonable inference;
> it is not based upon the perception of either interested parties or their
> lawyer-advocates . . . .[15]

Additionally, recusal on this ground requires "a rational basis for such questioning,

not an arbitrary basis, even though no actual impropriety on the part of the trial court

judge has been shown."[16]

---

[14] Georgia Code of Judicial Conduct Rule 2.11 & Former Georgia Code of Judicial Conduct Canon 3 (E) (1) (A); *see also State v. Wakefield*, 324 Ga. App. 587, 592-93 (2) (b) (751 SE2d 199) (2013) (quoting Canon (E) (1) (a) of the Judicial Code of Conduct).

[15] *Baptiste v. State*, 229 Ga. App. 691, 694 (1) (494 SE2d 530) (1997) (punctuation omitted); *accord Lemming v. State*, 292 Ga. App. 138, 141 (1) (663 SE2d 375) (2008),

[16] *Baptiste*, 229 Ga. App. at 694 (1); *accord Eastside Baptist Church v. Vicinanza,* 269 Ga. App. 239, 241 (603 SE2d 681) (2004).

In *Serdula I*, this Court questioned whether the averment of a "close relationship" between Green and Head would require assignment to another judge because "this claim lacks objective facts regarding the relationship."[17] But we also noted that even when the facts in an affidavit do not warrant recusal if assumed true, a judge "still maintains an ethical duty to recuse himself when he is independently aware of grounds to do so."[18] Indeed, under the Georgia Code of Judicial Conduct, judges are to "act at all times in a manner that promotes public confidence in the impartiality of the judiciary."[19] So, even though Serdula only alleged generally that Green and Head had a "close relationship[,]" we acknowledged in *Serdula I* that "Green . . . later admitted during a hearing on a recusal motion in *Post v. State*[20] that Head had served as his campaign treasurer for his ultimately

---

[17] *Serdula 1*, 344 Ga. App. at 589 (1).

[18] *Id.*

[19] *Id.* (punctuation omitted).

[20] 298 Ga. 241 (779 SE2d 624) (2015). In *Post*, the Supreme Court of Georgia reviewed Green's denial of a motion to recuse himself when the defendant alleged that "Green was employed by the Cobb County District Attorney's Office when [the defendant's] case was being handled by that office and that the Cobb County District Attorney, Patrick H. Head, was serving as the treasurer for . . . Green's election campaign." *Id.* at 242. As in *Serdula 1*, the *Post* Court vacated the recusal order, as well as the defendant's convictions, and remanded the case for a different judge to

10

abandoned 2010 State Court campaign."[21] And under these circumstances, we remanded the case for an evidentiary hearing before a different judge because "the extent, timing and nature of Head's involvement as treasurer [were] untold and need[ed] to be factually developed."[22]

Upon remand, Serdula's motion to recuse Green was reassigned to Judge Salmon, and a hearing was held on the motion at which Head was the sole witness. At the hearing, Head testified as follows. In 2010, at the time this case was tried, Head was the district attorney for the Cobb County Judicial Circuit. At some time prior to 2010, Green was an employee of the Cobb County District Attorney's Office, serving as an assistant district attorney. In late 2009 or early 2010, Green approached Head to discuss his desire to run for an open state court seat.[23] And during this discussion, Head agreed to serve as the treasurer for Green's campaign. But ultimately, Head did not establish an office as the treasurer, and he denied filling out

---

rule on the recusal motion. *See id.* at 242-43, 253 (2) (e).

[21] *Serdula I*, 344 Ga. App. at 588 (1).

[22] *Id.* at 592 (1).

[23] Head's wife was the judge who retired, leaving open the state court seat that Green sought to fill. But Head did not recall discussing his wife's retirement with Green other than when Green approached him about running for her seat.

11

any "paperwork" related to the campaign. Indeed, when Head agreed to serve as treasurer, "it was provided that [he] didn't have to do any work." So, while Green agreed to fill out any necessary paperwork and have Head sign it when necessary, Head only recalled signing two campaign disclosures. And although Head certified that the information on the disclosures was true, he did so solely in reliance on "[w]hoever gave [him] the document[s] and said that [they] had been prepared correctly." Head believed this practice to be "pretty common."

So, despite signing these disclosures, Head had no idea how Green kept track of his campaign's money. Head did not sign any checks for the campaign or make any deposits, as he was not even an authorized user on the campaign's bank account. Indeed, despite officially being named treasurer of the campaign, Head "was not involved with any of [Green's] [campaign] funds in any capacity." Head believed that the reason for listing him as the treasurer "was basically using [his] name to show that [he] was supporting [Green] in the race; that was the bottom line."[24] Simply put, according to Head, his involvement in Green's campaign was "nominal" or "minimal, if any."

_____

[24] Head testified that Green explicitly told him that he wanted to use Head's name as treasurer to show that he was supporting his campaign.

As it turns out, Green's campaign to be a state court judge was short lived. Indeed, while this campaign was still pending, Green was appointed to the Superior Court of Cobb County by then-Governor Sonny Perdue. And shortly thereafter, on October 21, 2010, his campaign for state court judge was terminated, and a final report was filed. Head had no involvement in that process. According to Head, not only did he have no involvement in Green's decision to seek the superior-court appointment, he was not even sure he was aware that Green was doing so at the time. Head claimed that his "whole involvement with [Green] had been for the state court, and [he] thought that's the position [Green] wanted." Head never spoke to the governor about the superior-court appointment being sought by Green, nor was he asked to make a recommendation as to who should be appointed. Head also did not believe that he had financially contributed to Green's state or superior-court campaigns. And as to his personal relationship with Green, Head testified that he "certainly wouldn't call them close friends[,]" because they never socialized together, and he did not think they had ever had lunch together. In Head's view, he and Green merely had an "employer-employee" relationship.

In *Post*, the Supreme Court of Georgia addressed whether Green should have recused himself from the case when the defendant alleged that "Head, the district

13

attorney whose office was prosecuting him, was serving as the treasurer for . . .

Green's election campaign[.]"[25] The defendant in *Post* presented documents showing

that "the district attorney, using the address of the district attorney's office, was

serving as the treasurer of . . . Green's active campaign for the Superior Court, not the

State Court seat the judge was seeking when he was appointed."[26] The *Post* Court

concluded that, given the statutory provisions governing the duties of campaign

treasurers, there is a "reasonable *inference* that a person selected to serve as the

treasurer of a judge's existing campaign committee is playing a significant role in

managing the financial activities of the judge's campaign, and the financing of a

campaign may be critical to its success in keeping the judge in office.[27] And as in

---

[25] *Post*, 298 Ga. at 250 (2) (d) (punctuation omitted).

[26] *Id.* At the evidentiary hearing in this case, Head denied any involvement in Green's superior-court campaign, testifying that one campaign disclosure presented to him at the hearing indicated that it was for the superior-court position, but all of the specific information provided in that document was for the state-court campaign. As discussed below, unlike in *Post*, none of the documents presented at the recusal hearing before Salmon were included with the transcript.

[27] *Post*, 298 Ga. at 251 (2) (d) (emphasis supplied).

*Serdula I*, the *Post* Court held that this inference was sufficient to warrant assigning the case to another judge for an evidentiary hearing.[28]

Nevertheless, our Supreme Court explained in *Post* that "[w]hen the fact-finder—the judge to whom the recusal motion is reassigned—determines what relevant facts are actually true and properly established, and what inferences from those facts should actually be made, it may turn out that the treasurer plays no especially important role in an ongoing or recent campaign."[29] Indeed,

> [i]t could be that the designation as treasurer was entirely honorary or otherwise nominal and the tasks that could be performed by the treasurer are in fact all performed by the candidate, the campaign chairperson, or campaign employees or contractors; that the campaign has been defunct for a significant period; or that other facts exist which, once made known to the fact-finder (and the public), would dissipate the appearance of partiality that might otherwise exist.[30]

But on the other hand, it may turn out that, "other than the candidate judge, the most important person in a particular campaign is the treasurer."[31] As a result, the *Post*

---

[28] *See id*

[29] *Id.*

[30] *Id.*

[31] *Id.*

15

Court remanded the case because "there were a number of undeveloped but potentially material facts bearing on the recusal question that need to be determined[.]"[32] Specifically, it appeared that questions remained "regarding . . . Green's campaign committee or committees, what judicial offices they were for and whether and when their activities were terminated, and the scope and nature of Head's functions as treasurer."[33] Ultimately, the *Post* Court held that the defendant's allegation that Head served as the treasurer of Green's campaign "*potentially* authorize[d] an order requiring . . . Green's recusal."[34]

Here, unlike in *Serdula I* and *Post*, this case has already been remanded to the trial court, the recusal motion was assigned to another judge, and a full evidentiary hearing was held to determine the nature and scope of Green and Head's relationship. And upon remand, the evidence showed that while Head served as Green's campaign treasurer close in time to Serdula's 2010 indictments and 2011 trial, Head had little to no involvement in the campaign. So, despite Serdula's unsupported claim that Head was "directly and significantly involved" in Green's campaign, Head *repeatedly*

---

[32] *Id.* at 252 (2) (d).

[33] *Id.*

[34] *Id.* (emphasis supplied).

16

testified that his name was listed as treasurer solely to show his support for the campaign. And while Head signed certain campaign disclosures, he did no work in preparing them. Indeed, Head only agreed to be Green's treasurer if the position did not require him to do any work. And importantly, Head testified that he did *not* have a close relationship with Green, nor did they socialize together.

Suffice it to say, any analysis of the necessity for recusal is, by its very nature, "fact-bound, requiring an examination of the nature and extent of any business, personal, social or political associations, and an exercise of judgment concerning just how close and how extensive (and how recent) these associations are or have been to mandate recusal."[35] And when the trial court sits as trier of fact, its findings "shall not be set aside unless clearly erroneous."[36] Furthermore, the clearly erroneous test is the same as the any-evidence rule, and as a result, we will "not disturb fact findings

---

[35] *Baptiste*, 229 Ga. App. at 694 (1); *Chastain v. State*, 239 Ga. App. 602, 605 (3) (521 SE2d 657) (1999).

[36] *Keenum v. State*, 248 Ga. App. 474, 476 (4) (546 SE2d 288) (2001) (punctuation omitted); *accord Salazar v. State*, 256 Ga. App. 50, 51 (1) (567 SE2d 706) (2002); *see Post*, 298 Ga. at 251 (2) (d) (noting that the judge to whom the recusal motion is reassigned is the factfinder).

of a trial court if there is any evidence to sustain them."[37] And here, based on Head's testimony, Salmon, as the fact-finder, determined that "there was not a 'close relationship' between . . . Green and Head," and "[t]he facts developed through the testimony of Head at the hearing and the exhibits presented dissipate the appearance of partiality." This finding was not clearly erroneous because Head's testimony supported it.[38]

Nevertheless, Serdula appears to contend that the exhibits he presented at the recusal hearing, which apparently included campaign-disclosure statements with Head's signature on them, conclusively establish that Head served a significant role in Green's campaign, and as a result, his recusal was warranted. This argument is a nonstarter. To begin with, none of those exhibits are included with the transcript of the recusal hearing, and so, we are unable to confirm their contents.[39] In any event,

---

[37] *Keenum*, 248 Ga. App. at 476 (4) (punctuation omitted); *accord Salazar*, 256 Ga. App. at 51 (1).

[38] *See supra* notes 36-37 & accompanying text.

[39] *See Benton v. State*, 286 Ga. App. 736, 736 (649 SE2d 793) (2007) ("[A]n appellant bears the burden of showing error affirmatively by the record, and [when] the transcript does not fully disclose what transpired at trial, it is the duty of the complaining party to have the record completed . . . ." (punctuation and citation omitted)).

Head *admitted* that he agreed to serve as the treasurer of Green's state-court campaign, albeit in name only. Additionally, Head acknowledged that—with the exception of one disclosure report which mistakenly suggested that he served as treasurer for Green's *superior court* campaign—he signed at least two campaign disclosures. So, even assuming that Serdula accurately describes the exhibits, the trial court apparently credited Head's testimony that he played no significant role in the campaign, did not prepare the disclosures, and signed the disclosures solely in reliance on someone else.[40]

If, as Serdula suggests, the *sole* fact that—close in time to his prosecution—Head served as treasurer of one of Green's campaigns warranted his recusal, the Supreme Court in *Post* and this Court in *Serdula I* would simply have remanded the case and ordered Green to recuse himself. But instead, both cases were remanded for an evidentiary hearing to determine the nature and scope of Green and

---

[40] Serdula also claims that Head contributed $1,000 to Green's superior-court campaign, but in support, he cites to an exhibit that does not exist in the record. The only evidence in the record before us is Head's testimony that he did not believe he contributed to either of Green's campaigns. Regardless, our Supreme Court has held that "[a]lthough a trial judge should recuse himself or herself from presiding over a case involving a party who has previously made an exceptionally-large campaign contribution, . . . recusal is not required simply because the judge previously received *any* campaign contribution from a party." *Gude v. State*, 289 Ga. 46, 50 (2) (c) (709 SE2d 206) (2011).

Head's actual relationship. And as contemplated in *Post*, the actual evidence presented in *this* case supported Salmon's conclusion that Head "play[ed] no especially important role in an ongoing or recent campaign."[41] As a result, we cannot say that the trial court abused its discretion in denying Serdula's motion to recuse Green from his case.[42]

---

[41] *Post*, 298 Ga. at 251 (2) (e).

[42] *See Post*, 298 Ga. at 248 (2) (d) (holding that a judge's prior employment with the district attorney's office when the office was handling the defendant's case was insufficient to warrant recusal of the judge); *Id.* at 251 (2) (d) (suggesting that a district attorney who served as treasurer of a judge's campaign need not recuse himself *if* the evidence shows that, as here, "the designation as treasurer was entirely honorary or otherwise nominal and the tasks that could be performed by the treasurer are in fact all performed by the candidate, the campaign chairperson, or campaign employees or contractors . . . ."); *Gude*, 289 Ga. at 50 (2) (b)-(c) (holding that a judge was not required to recuse herself when, *inter alia*, she was a former employee of the district attorney and the district attorney contributed to her campaign); *Patterson v. Butler*, 187 Ga. App. 740-41 (1) (371 SE2d 268) (1988) (holding that the trial court did not abuse its discretion in denying a motion to recuse that alleged, in part, that the attorney at issue had served as chief investigative assistant for the district attorney's office during the judge's tenure there and had worked in the judge's political campaigns); *Zaias v. Kaye*, 643 So2d 687, 687 (Fla. Dist. Ct. App.1994) ("The fact that an attorney made a campaign contribution or served as one of over 60 members of a judge's re-election campaign committee does not, without more, require disqualification."); *see also Post*, 298 Ga. at 248 (2) (d) (noting that "[a]s a practical matter, most donors in judicial campaigns are lawyers and litigants who may appear before the judge they are supporting" (punctuation omitted)); *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 467 (135 SCt 1656, 191 LEd2d 570) (2015) (Scalia, J., dissenting) ("The peaceful coexistence of judicial elections and personal solicitations for most of our history calls into doubt any claim that allowing personal solicitations would

20

2. Next, Serdula argues that the trial court erred in entering the State's proposed order denying his recusal motion without giving him an opportunity to respond to the State's erroneous proposed findings of fact. Again, we disagree.

Before reaching this claim of error, Serdula argues at length that, because the parties stipulated to the exhibits admitted at the recusal hearing and those exhibits are public records, the trial court was required to consider them accurate and reliable. But in the trial court's order, it concludes that one of Serdula's exhibits—a print out from the Georgia Government Transparency and Campaign Finance Commission—"is clearly in error." The court reached this conclusion because, "[w]hile it may say 'Office Sought Judge Superior Court,' the Committee Information is 'Reuben Green for State Court Judge' and lists the committee Judge Green had for his State Court Campaign."

As previously mentioned, the exhibits presented at the recusal hearing are *not* included with the transcript in the record before us, and under such circumstances, we

imperil public faith in judges. Many States allow judicial candidates to ask for contributions even today, but nobody suggests that public confidence in judges fares worse in these jurisdictions than elsewhere.").

21

must accept the trial court's description of the exhibits as true.[43] Moreover, the court's description of that exhibit as reporting, in substance, on Green's state court campaign is consistent with Head's testimony that—while he was treasurer of this campaign—he had no involvement in Green's pursuit of his current superior court seat. Furthermore, there is nothing in the appellate record indicating that the parties stipulated to the *accuracy* of these exhibits, as opposed to merely their admissibility.[44] As a result, we will not presume that they agreed to anything beyond that.

The campaign disclosure printout was, of course, admitted into evidence under OCGA § 24-8-803 (8), which provides that public records and reports "shall not be excluded by the hearsay rule, even though the declarant is available as a witness." This hearsay exception "closely tracks its federal counterpart, Fed. R. Evid. 803 (8),"

---

[43] *See Crawford v. State*, 288 Ga. 425, 427 (2) (a) (704 SE2d 772) (2011) ("An appellant has the burden of proving trial court error by the appellate record, and must compile a complete record of what transpired in the trial court. Otherwise, there is not sufficient information for an appellate court's review and the trial court ruling enumerated as error must be upheld. When a portion of the evidence bearing upon the issues raised by the enumerations of error is not brought up in the appellate record so that this court can make its determination from a consideration of it all, an affirmance as to that issue must result." (punctuation omitted)).

[44] *See Sisson v. State*, 181 Ga. App. 784, 788 (353 SE2d 836) (1987) ("Merely because a party stipulates to admissibility of testimony or evidence, does not deny that party the right to contest the accuracy of that testimony or evidence."); *Harris v. State*, 308 Ga. App. 523, 526 (707 SE2d 908) (2011) (same).

and is "based on both the necessity for admitting such records and their inherent trustworthiness."[45] It is fair to say, then, that, generally speaking, a campaign-disclosure report is an inherently reliable source of information because the information contained in this document is provided by someone—here, Green—under

---

[45] Ronald L. Carlson and Michael Scott Carlson, Carlson on Evidence, p. 549 (6th ed. 2018); *see United States v. Enterline*, 894 F2d 287, 289 (II) (A) (8th Cir. 1990) ("The hearsay exception for public records is based on both the necessity for admitting such records and their inherent trustworthiness."); *United States v. Quezada*, 754 F2d 1190, 1193 (5th Cir. 1985) ("Two principal reasons underlie this exception to the general rule excluding hearsay: the presumed trustworthiness of public documents prepared in the discharge of official functions, and the necessity of using such documents, due to the likelihood that a public official would have no independent memory of a particular action or entry where his duties require the constant repetition of routine tasks." (footnote omitted)).

a "legally imposed duty"[46] and is "the subject of a reporting duty."[47] But that hardly

means that *every* public record is error free or immune from scrutiny once it is

admitted into evidence. For example, OCGA § 24-8-806 provides that "[w]hen a

hearsay statement has been admitted in evidence, the credibility of the declarant may

be attacked and, if attacked, may be supported by any evidence which would be

---

[46] *See* OCGA § 21-5-2 ("It is declared to be the policy of this state, in furtherance of its responsibility to protect the integrity of the democratic process and to ensure fair elections . . . to institute and establish a requirement of public disclosure of campaign contributions and expenditures relative to the seeking of such offices . . . [and] that the state's public affairs will be best served by disclosures of significant private interests of public officers and officials which may influence the discharge of their public duties and responsibilities . . . [and] that it is for the public to determine whether significant private interests of public officers have influenced the state's public officers to the detriment of their public duties and responsibilities and, in order to make that determination and hold the public officers accountable, the public must have reasonable access to the disclosure of the significant private interests of the public officers of this state."); *see also generally* OCGA § 21-5-34.

[47] *Wetherill v. Univ. of Chicago*, 518 F. Supp. 1387, 1390 (1) (N.D. Ill. 1981); *see id.* (holding that Rule 803 (8) "permits the introduction of a public record only if it is made from matters within the personal knowledge of (1) a public official making the report (or his agent) or (2) someone with a duty to report the matter to a public official"); *see also Bullcoming v. New Mexico*, 564 U.S. 647, 659 (II) n.6 (131 SCt 2705, 180 LEd2d 610) (2011) (holding that "business and public records are generally admissible absent confrontation because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial" (punctuation omitted)), *quoting Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (III) (D) (129 SCt 2527, 174 LEd2d 314) (2009); *State v. Jefferson*, 302 Ga. 435, 441 (807 SE2d 387, 392 (2017) (same).

admissible for those purposes if the declarant had testified as a witness." So, if instead of relying on Green's campaign-disclosure report to support his argument, Serdula instead wanted to attack or question the veracity of the information contained in the report, Rule 806 would allow him to do so. But here, Serdula is attempting to preclude Head from explaining or clarifying obvious inconsistencies in Green's campaign-disclosure report (*i.e.*, relevant evidence),[48] which only serves to undermine the truth-seeking process.[49] Simply put, Serdula has presented no legal authority suggesting that trial courts are *required* to accept the accuracy of public records even

---

[48] *See* OCGA § 24-4-401 (noting that "the term 'relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."); OCGA § 24-4-402 ("All relevant evidence shall be admissible, except as limited by constitutional requirements or as otherwise provided by law or by other rules, as prescribed pursuant to constitutional or statutory authority, applicable in the court in which the matter is pending. Evidence which is not relevant shall not be admissible.").

[49] *See* OCGA § 24-1-1 ("The object of all legal investigation is the discovery of truth. Rules of evidence shall be construed to secure fairness in administration, eliminate unjustifiable expense and delay, and promote the growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined.").

when, as here, the record itself is internally inconsistent and conflicts with witness testimony.[50]

Serdula also argues that the trial court erred in "not granting" his motion for reconsideration of the recusal order because he was not afforded a right to object to the State's erroneous proposed findings of fact before the court's "carte blanche" entry of the State's proposed order. But Serdula filed his notice of appeal on April 29, 2019, before filing his motion for reconsideration on May 2, 2019. So, as the record stands before us, the trial court has yet to rule on Serdula's motion for reconsideration; but regardless, it lacks jurisdiction to do so. Indeed, as a general rule, in civil actions other than injunctions, a trial court, "upon the filing of a notice of appeal, loses jurisdiction to modify or enforce a judgment which is the subject of the appeal during the period of supersedeas."[51] And because it is well settled that a notice

_____

[50] *See Jones v. State*, 326 Ga. App. 151, 153 (756 SE2d 267) (2014) ("It is well established . . . that resolving evidentiary conflicts and inconsistencies . . . are the province of the factfinder, not this Court." (punctuation omitted)); *Major v. State*, 280 Ga. 746, 747 (632 SE2d 661) (2006) (same).

[51] *Mughni v. Beyond Mgmt. Grp., Inc.*, 349 Ga. App. 398, 402 (3) (825 SE2d 829) (2019) (punctuation omitted); *see Gomez v. Innocent*, 323 Ga. App. 1, 4 (3) (746 SE2d 645) (2013) ("A notice of appeal divests the trial court of jurisdiction to supplement, amend, or modify the judgment while the appeal of that judgment is pending.").

of appeal "divests the trial court of jurisdiction to consider a motion for reconsideration of that judgment," the trial court "lack[s] jurisdiction to rule on [Serdula's] motion for reconsideration."[52]

3. Serdula also contends that the trial court erred in denying his motion to suppress the evidence retrieved from his cell phone. This claim likewise lacks merit.

Our Supreme Court has identified three corollaries of the principle, "which limit the scope of review in appeals from a grant or denial of a motion to suppress in which the trial court has made express findings of disputed facts."[53] Specifically, an appellate court must construe the evidentiary record "in the light most favorable to the trial court's factual findings and judgment[,] . . . accept the trial court's factual findings unless they are clearly erroneous, . . . and[,] . . .limit its consideration of the disputed facts to those expressly found by the trial court."[54] Furthermore, although we

---

[52] *Mughni*, 349 Ga. App. at 402 (3); *see Moon v. State*, 288 Ga. 508, 517 (11) (705 SE2d 649) (2011) (holding that the trial court lacked jurisdiction to consider the order being appealed when appellant filed notice of appeal before trial court had ruled on motion for reconsideration).

[53] *Hughes v. State*, 296 Ga. 744, 746 (1) (770 SE2d 636) (2015); *accord Williams v. State*, 301 Ga. 60, 61 (799 SE2d 779) (2017); *Thompson v. State*, 348 Ga. App. 609, 611 (1) (824 SE2d 62) (2019).

[54] *Westbrook v. State*, ___ Ga. ___, No. S19A1120, 2020 WL 967164, ___ (2) (decided Feb. 28, 2020) (punctuation and citations omitted); *see Kennebrew v. State*,

owe "substantial deference to the way in which the trial court resolved disputed questions of material fact, we owe no deference at all to the trial court with respect to questions of law, and instead, we must apply the law ourselves to the material facts."[55] With these guiding principles in mind, we turn to Serdula's specific claim of error.

(a) *Probable Cause*. Serdula claims that there was no probable cause to support the issuance of a warrant to search his cell phone. As explained by our Supreme Court, a search warrant will "only issue upon facts sufficient to show probable cause

---

304 Ga. 406, 409 (819 SE2d 37) (2018) (holding that, in reviewing a trial court's ruling on a motion to suppress evidence, "an appellate court must construe the evidentiary record in the light most favorable to the trial court's factual findings and judgment[,] and . . . limit its consideration of the disputed facts to those expressly found by the trial court" (punctuation omitted)); *Thompson*, 348 Ga. App. at 611-12 (1) (explaining that when reviewing a trial court's ruling on a motion, "[o]ur appellate courts generally must (1) accept a trial court's findings unless they are clearly erroneous, (2) construe the evidentiary record in the light most favorable to the factual findings and judgment of the trial court, and (3) limit our consideration of the disputed facts to those expressly found by the trial court" (footnotes omitted)); *State v. Bowman*, 337 Ga. App. 313, 313 (787 SE2d 284) (2016) (same).

[55] *Hughes*, 296 Ga. at 750 (2); *see Thompson*, 348 Ga. App. at 611 (1) (explaining that when the facts material to a motion to suppress are disputed, it "generally is for the trial judge to resolve those disputes and determine the material facts[,]" but we review *de novo* the trial court's "application of law to the undisputed facts").

28

that a crime is being committed or has been committed."[56] And the magistrate's task in determining if probable cause exists to issue as search warrant is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."[57] So, our review of the magistrate's decision is limited to "determining if the magistrate had a substantial basis for concluding that probable cause existed to issue the search warrant."[58] Further, a presumption of validity attaches to "an affidavit supporting a search warrant[,] [and] . . . doubtful cases should be resolved in favor of upholding search warrants."[59]

---

[56] *State v. Palmer*, 285 Ga. 75, 77 (673 SE2d 237) (2009) (punctuation omitted); *accord Creamer v. State*, 337 Ga. App. 394, 395 (788 SE2d 69) (2016); (2016); *James v. State*, 312 Ga. App. 130, 132 (717 SE2d 713) (2011).

[57] *Palmer*, 285 Ga. at 77 (punctuation omitted); *accord State v. Stephens*, 252 Ga. 181, 182 (311 SE2d 823) (1984); *Galvan v. State*, 240 Ga. App. 608, 608 (524 SE2d 297) (1999).

[58] *Reid v. State*, 321 Ga. App. 653, 654 (1) (742 SE2d 166) (2013) (punctuation omitted); *accord Palmer*, 285 Ga. at 78; *Galloway v. State*, 332 Ga. App. 389, 389-90 (772 SE2d 832) (2015).

[59] *Reid*, 321 Ga. App. at 654 (1) (punctuation omitted); *accord Galloway*, 332 Ga. App. at 390; *see Palmer*, 285 Ga. at 77-78 ("Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable

Importantly, substantial deference is to be afforded to "a magistrate's decision to issue a search warrant based on a finding of probable cause."[60]

Here, the following facts were set forth in Twiggs's affidavit and application for a search warrant.

> On 11/18/2009 the Cobb County Police Department responded to [a dentist office]. When officers arrived they met with Kim Nimmons, an employee. Nimmons stated that she was in the bathroom at the office and noticed a hole in the padding surrounding the pipes to the sink. She looked closer and discovered a black in color Verizon LG cellphone inside the padding.[61] The cell[ ]phone had a camera function and the camera lens was pointing in the direction of the toilet. She notified office staff of the discovery. Nimmons advised that she noticed the same hole in the padding last week, but there was no camera.

---

cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." (punctuation omitted)).

[60] *Reid*, 321 Ga. App. at 654 (1) (punctuation omitted); *see Palmer*, 285 Ga. at 78 ("[A] magistrate's decision to issue a search warrant based on a finding of probable cause is entitled to substantial deference by a reviewing court." (punctuation omitted); *Galloway*, 332 Ga. App. at 390 (same).

[61] The stipulated facts and the evidence at the suppression hearing are inconsistent as to whether Nimmons or Twiggs was the first person to realize that the hidden device was, in fact, a phone, but we do not find this discrepancy to be material.

Officers and investigators located a black cell[ ]phone positioned inside the padding in the bathroom. The cell[ ]phone was positioned to view the commode in the bathroom. While collecting the cell[ ]phone[,] Paul Serdula approached the affiant and Ofc. Stallings. He stated that the cell[ ]phone was his. We interviewed Serdula at the office. He stated that he suspected someone of stealing drugs from the office and had placed the cell[ ]phone in the bathroom in an attempt to video the person secreting the drugs. He stated he placed the cell[ ]phone in the bathroom this morning around 0800 HRS. He also stated it was the first time he had done this. The affiant spoke with the office management and they advised that Serdula had never reported any suspicions of drugs missing.

Serdula was then arrested and charged with unlawful surveillance.

OCGA § 16-11-62 (2) provides that—with some exceptions not applicable here—"[i]t shall be unlawful for . . . [a]ny person, through the use of any device, without the consent of all persons observed, to observe, photograph, or record the activities of another which occur in any private place and out of public view." Significantly, Serdula *admitted* that he hid his phone in the bathroom to secretly record other employees who he believed were stealing drugs.[62] And even though the

---

[62] At the suppression hearing, Stallings testified that, after Serdula admitted owning the phone, he and Twiggs interviewed Serdula in a nearby office. After being read his *Miranda* rights, Serdula told them that he placed the camera in the bathroom because he believed someone was stealing drugs or needles from the dental practice, and he was attempting to record the person who was doing so. After admitting that

31

record reveals that Serdula was recording employees for sexual purposes, OCGA § 16-11-62 (2) does not require the defendant to record others with any particular purpose. So, under such circumstances, there was a fair probability that he was using the phone to unlawfully record activities of others in a private place in violation of OCGA § 16-11-62 (2).[63]

Nevertheless, Serdula argues that the magistrate issued the search warrant based on false information provided by Twiggs. Specifically, Serdula contends that Twiggs failed to inform the magistrate that the phone was turned off and that he falsely claimed the phone's camera was aimed at the toilet, rather than the lockers.[64]

---

he concealed the camera in the bathroom to record other employees without their consent, he was arrested for unlawful surveillance.

[63] *See Armstead v. State,* 293 Ga. 243, 243, 244 (1) (744 SE2d 774) (2013) (holding that evidence was sufficient to support conviction for unlawful eavesdropping and surveillance (and other crimes) when, *inter alia*, defendant "placed a video camera in a women's restroom at his workplace and commenced a scheme whereby he would record his female co-workers using the restroom, retrieve the tapes and replace them after-hours, and take the tapes home where he watched and stored them"); *Price v. State*, 320 Ga. App. 85, 85, 86 (2) (738 SE2d 289) (2013) (holding that there was sufficient evidence to support a conviction for unlawful surveillance when the 14-year old victim's step-father secretly recorded her in her bedroom while she was changing close after a shower without her consent).

[64] Nimmons, who was the first person to notice the phone, testified that the camera was pointed towards "the toilet area." She also testified that it was "possibl[e]" that it was *also* facing the lockers. Twiggs testified that the camera of the

Serdula quotes portions of Twiggs's affidavit and provides an alternative version of how the affidavit *should have* read. But other than citing Twiggs's search-warrant affidavit, Serdula cites no evidence in the record to support his version of the facts, even when purporting to quote witnesses. And while Serdula summarily contends that Twiggs's affidavit included "exaggerations and misrepresentations," it is not the function of this Court to "cull the record on behalf of a party in search of instances of error."[65] In any event, to the extent that there were any discrepancies between the search-warrant affidavit and the testimony presented at the suppression hearing, it was for the trial court, as the fact finder, to resolve any conflicts in the evidence and to determine the credibility of witnesses.[66]

---

phone was facing such that the "area where someone would be using . . . the toilet" would be recorded. Twiggs also testified that when he discovered the phone, it appeared to be off. But regardless of the camera angle and whether the phone was turned on at the time it was discovered, Serdula admitted the reason he hid his phone in the bathroom was to record other employees without their consent.

[65] *Cawthon v. State*, 350 Ga. App. 741, 743 (830 SE2d 270) (2019); *see Dixon v. Metro. Atlanta Rapid Transit Auth.*, 242 Ga. App. 262, 266 (4) (529 SE2d 398) (2000) ("[A]ppellate judges should not be expected to take pilgrimages into records in search of error without the compass of citation and argument." (punctuation omitted)).

[66] *See Van Auken v. State*, 304 Ga. App. 802, 805 (697 SE2d 895) (2010) ("In ruling on a motion to suppress, the trial court sits as the trier of fact and thus is charged with resolving any conflicts in the evidence and assessing the credibility of

Serdula also maintains, without any citations to supporting legal authority, that—even absent the alleged inaccuracies and omissions in Twiggs's affidavit—the affidavit still failed to establish probable cause sufficient to support the issuance of the search warrant. And he contends, again without citing *any* support in the record, that the cell phone was turned off and there was no evidence that any eavesdropping took place. But to establish probable cause, the search-warrant affidavit did not have to present evidence conclusively establishing that a crime had been committed. Instead, the affidavit only needed to establish that there was "a fair *probability* that contraband or evidence of a crime [would] be found in a particular place."[67] Here, Twiggs averred that Serdula admitted to owning a phone that he concealed in a private place to record fellow employees that he suspected of stealing drugs. The magistrate found Twiggs to be credible and made a reasonable, common-sense determination that these allegations created a fair probability that Serdula unlawfully

the witnesses.").

[67] *Palmer*, 285 Ga. at 77 (punctuation omitted) (emphasis supplied); *see supra* note 57 & accompanying text.

34

surveilled employees of the dental office while they were in the bathroom in violation of OCGA § 16-11-62 (2).[68]

In sum, given the substantial deference we owe to a magistrate's decision to issue a search warrant, and viewing the facts in the light most favorable to the trial court's decision, we cannot say that the trial court abused its discretion in finding that there was probable cause to issue a search warrant for Serdula's phone.

(b) *The Particularity Requirement.* Serdula also argues that the evidence obtained from his phone should have been suppressed because the search warrant failed to satisfy the Fourth Amendment's particularity requirement. Serdula is indeed correct that the Fourth Amendment to the United States Constitution "provides that 'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the . . . things to be seized.'"[69] In this regard, we have explained that "[a]lthough a warrant cannot leave

---

[68] *See supra* note 57 & accompanying text; OCGA § 16-11-62 (2) (providing that "[i]t shall be unlawful for . . . [a]ny person, through the use of any device, without the consent of all persons observed, to observe, photograph, or record the activities of another which occur in any private place and out of public view").

[69] *Leili v. State,* 307 Ga. 339, 341, 834 SE2d 847, 852 (2019) (quoting U.S. Const. amend. IV); *see* Ga. Const. Art. I, § I, ¶ XIII ("The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue except upon probable cause

the determination of what articles fall within its description and are to be seized entirely to the judgment and opinion of the officer executing the warrant, the degree of specificity in the description is flexible and will vary with the circumstances involved."[70] Indeed, the "particularity requirement" only demands that "the executing officer be able to identify the property sought with reasonable certainty."[71]

In this case, the relevant portion of the search warrant provided that the thing and place to be searched was "a black in color LG Verizon cellphone that was collected from the pipe padding of the bathroom at 600 Galleria Pkwy Suite 800, Atlanta, Georgia 30339 to access the phone to look for information to verify the owner of the phone, any recorded files, videos, and all phone activity logs." But Serdula argues that the search warrant was overly broad because it did not specify that the removable memory card in the phone, which is a "separate and distinct" component of the phone, would be searched. We disagree.

---

supported by oath or affirmation particularly describing the place or places to be searched or the persons or things to be seized.").

[70] *Reyes-Castro v. State*, 352 Ga. App. 48, 60 (1) (b) (833 SE2d 735) (2019); *accord Reaves v. State,* 284 Ga. 181, 184 (2) (d) (664 SE2d 211) (2008),

[71] *Reyes-Castro*, 352 Ga. App. at 60 (1) (b); *accord Reaves*, 284 Ga. at 187 (2) (d).

As previously noted, the level of specificity required is flexible and will vary with the circumstances involved.[72] And here, the search warrant specified that the phone was to be searched for recorded files and videos, and the forensic analyst testified that those files are stored on the memory card, which is retrieved from *inside* the phone. Additionally, our Supreme Court has held that "although an electronic device, a cell phone is 'roughly analogous' to a container that properly can be opened and searched for electronic data, similar to a traditional container that can be opened to search for tangible objects of evidence."[73] Indeed, the similarity of a cell phone to a traditional container in which there might be found physical entities of evidence is clear; "it is reasonable to believe that the object of the search will be found *inside* the cell phone."[74] Thus, although the search warrant did not specifically

---

[72] *See supra* note 70 & accompanying text.

[73] *Hawkins v. State*, 290 Ga. 785, 786 (723 SE2d 924) (2012), *abrogation on other grounds recognized* by *Westbrook*, ___ Ga. ___, 2020 WL 967164, ___ (3) (a). As noted in *Hawkins*, "[t]his conclusion has been reached by other courts." *Id.* at 786 (citing *United States v. Finley*, 477 F3d 250, 260 (III) (B), n.7 (5th Cir.2007) and *United States v. Wurie*, 612 FSupp2d 104, 109 (D.Mass.2009), *reversed and remanded on other grounds by United States v. Wurie*, 728 F3d 1 (1st Cir. 2013); *see also United States v. Deans*, 549 FSupp2d 1085, 1094 (1) (b) (D.Minn.2008) (agreeing with the Fifth Circuit that, "if a cell phone is lawfully seized, officers may also search any data electronically stored in the device").

[74] *Hawkins*, 290 Ga. at 786 (emphasis supplied).

reference the memory card, a search of the phone would necessarily include its contents, which included the memory card.[75]

Serdula also maintains that the search warrant was not specific enough regarding the type of files to be recovered. But as evidenced *supra*, the warrant *did* specify the types files to be recovered—"recorded files, videos, and all phone activity logs." For comparison, our Supreme Court recently held that "the use of the phrase 'electronic data' was specific enough to enable a prudent officer to know to look for photographs and videos stored on [a defendant's] cell phone."[76] Thus, a search warrant specifically instructing the officer to look for recordings and videos is also sufficient.[77]

---

[75] *See supra* note 73 & accompanying text; *infra* note 76 & accompanying text.

[76] *Westbrook*, ___ Ga. ___, 2020 WL 967164, ___ (3) (a); *see Hawkins*, 290 Ga. at 786 (noting that a cell phone is an "electronic device" that can be searched for "electronic data" and describing the types of data that can be discovered as including emails, text messages, and photographs). *Cf. Smith v. State*, 274 Ga. App. 106, 110 (3) (616 SE2d 868) (2005) (holding that search warrant affidavit sufficiently described items to be searched when it sought evidence of child molestation and sexual exploitation of children, including, but not limited to, pictures, computers, and videos).

[77] Regardless of the search warrant's language, the forensic analyst testified that he only looked for picture and video files. Moreover, only video files were referenced in the stipulated facts that formed the basis of Serdula's convictions. Thus, even if the search warrant were overly broad, Serdula cannot show that he was

4. Serdula also argues that there was insufficient evidence to support his conviction for aggravated sodomy. Again, we disagree.

In challenging the sufficiency of the evidence to support his convictions for aggravated sodomy, Serdula does not allege that the State failed to prove any particular element of the offense. Instead, he summarily contends that, absent the evidence he claims should have been suppressed, there was insufficient evidence to support his convictions. But because we hold in Division 3 *supra* that the trial court properly admitted the video files recovered from Serdula's cell phone, this argument lacks merit.

5. Finally, Serdula argues that his trial counsel was ineffective for failing to argue that he suffered from a delusional-compulsion disorder that rendered him incompetent to stand trial. Once again, we disagree.

To prevail on his Sixth Amendment claim of ineffective assistance, a claimant "must show both that counsel's performance was deficient and that the deficient performance prejudiced [him]."[78] And with respect to deficient performance, a

harmed by it. *See West v. State*, 300 Ga. App. 583, 584-85 (1) (685 SE2d 486) (2009) ("In order to constitute reversible error, there must be harm as well as error.").

[78] *McAllister v. State*, 351 Ga. App. 76, 93 (6) (830 SE2d 443) (2019) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LEd2d 674)

claimant must show that his attorney performed at trial in "an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms."[79] Moreover, when reviewing counsel's performance, we apply a strong presumption that counsel's representation was "within the 'wide range' of reasonable professional assistance."[80] Indeed, to show that he was prejudiced by the performance of his counsel, a claimant must "prove a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[81] And a reasonable probability is "a probability sufficient to undermine confidence in the outcome."[82] Finally, the trial court's factual findings and credibility determinations are "reviewed under a clearly erroneous standard, but this Court will

---

(1984)).

[79] *Jackson v. State*, 306 Ga. 266, 272 (5) (830 SE2d 99) (2019) (punctuation omitted); *accord Romer v. State*, 293 Ga. 339, 344 (3) (745 SE2d 637) (2013).

[80] *Jackson*, 306 Ga. at 272 (5) (punctuation omitted); *accord Romer*, 293 Ga. at 344 (3).

[81] *Jackson*, 306 Ga. at 272 (5) (punctuation omitted); *accord Arnold v. State*, 292 Ga. 268, 269 (2) (737 SE2d 98) (2013).

[82] *Jackson*, 306 Ga. at 272 (5) (punctuation omitted); *accord Arnold*, 292 Ga. at 269 (2).

independently apply the legal principles to the facts."[83] With these guiding principles in mind, we will address Serdula's specific ineffective-assistance claim.

In Georgia, a person is not legally insane simply because "he suffers from schizophrenia or a psychosis."[84] Instead, a defendant is not guilty by reason of insanity if, at the time of the criminal act, he or she "did not have the mental capacity to distinguish between right and wrong in relation to such act or a mental disease caused a delusional compulsion that overmastered his will to resist committing the crime."[85] Furthermore, a finding of insanity based upon OCGA § 16-3-3[86] requires proof that "(1) the accused acted under a delusional compulsion; (2) the criminal act was connected with the delusion; and (3) the delusion related to a fact which, if true,

---

[83] *Jackson*, 306 Ga. at 272 (5) (punctuation omitted); *accord Jones v. State*, 305 Ga. 750, 755 (4) (827 SE2d 879) (2019).

[84] *Simon v. State*, 321 Ga. App. 1, 2 (1) (740 SE2d 819) (2013) (punctuation omitted); *accord Woods*, 291 Ga. 804, 810 (3) (733 SE2d 730) (2012).

[85] *Simon*, 321 Ga. App. at 2-3 (1) (punctuation omitted); *accord Woods*, 291 Ga. at 810 (3).

[86] *See* OCGA § 16-3-3 ("A person shall not be found guilty of a crime when, at the time of the act, omission, or negligence constituting the crime, the person, because of mental disease, injury, or congenital deficiency, acted as he did because of a delusional compulsion as to such act which overmastered his will to resist committing the crime.").

41

would have justified the act."[87] Of course, defendants are presumed sane, and "a defendant claiming insanity bears the burden to prove his insanity by a preponderance of the evidence."[88]

Here, Serdula contends that his trial counsel was deficient for failing to argue that he suffered from a delusional compulsion that rendered him incompetent to stand trial. But as explained *supra*, for a defendant to prevail on an insanity defense based on a delusional compulsion, the defendant must show that he was laboring under that compulsion *at the time* of the criminal act,[89] and thus, for purposes of Serdula's particular ineffective-assistance claim, his mental state at the time of trial is

---

[87] *Simon*, 321 Ga. App. at 3 (1) (punctuation omitted); *VanVoorhis v. State*, 234 Ga. App. 749, 749 (507 SE2d 555) (1998).

[88] *Simon*, 321 Ga. App. at 3 (1) (punctuation omitted); *accord Alvelo v. State*, 290 Ga. 609, 612 (3) (724 SE2d 377) (2012).

[89] *See Woods*, 291 Ga. at 810 ("It is only in those instances where an individual, who is able to distinguish right from wrong, *commits a criminal act while suffering under a delusional compulsion* which leads him to believe his action is right, i.e., ' justified,' that Georgia law accepts insanity as a defense." (punctuation omitted) (emphasis supplied)); *Boswell v. State*, 275 Ga. 689, 690 (1) (572 SE2d 565) (2002) ("[A] defendant is not guilty by reason of insanity if, *at the time of the criminal act*, the defendant did not have the mental capacity to distinguish between right and wrong in relation to such act" or a mental disease caused a delusional compulsion that overmastered her will to resist committing the crime." (punctuation omitted) (emphasis supplied)).

irrelevant.[90] Significantly, Serdula has not identified any *specific* delusion related to any particular fact which, if true, would have justified his criminal acts.[91] Instead, relying on a psychological report prepared by Dr. Robert Shaffer and submitted at the motion-for-new trial-hearing,[92] Serdula contends, generally, that, despite having the report prior to sentencing, his counsel was ineffective for failing to present evidence of delusional compulsions to the trial court.

---

[90] At the outset of trial, when the trial court questioned Serdula at length regarding his decision to proceed with a stipulated bench trial, Serdula understood and answered each question appropriately without any indication that he was confused or mentally impaired. Among other things, Serdula testified that he was able to understand statements and questions, he had never been a patient in a mental institution or under the care of a psychologist or psychiatrist, and he understood that he was waiving his right to a jury trial. Serdula's counsel represented to the court that he believed Serdula understood the stipulated facts, and how stipulations affected his rights. Ultimately, the court found that based on Serdula and his counsel's responses to its questions, as well as the court's observations in the courtroom, Serdula understood his various rights, and he chose a stipulated bench trial as opposed to a jury trial freely, knowingly, and voluntarily without undue influence, compulsion, or duress. Thus, although it is irrelevant to a delusional-compulsion defense, it is worth noting that there is no indication in the record that Serdula was laboring under any mental disability at the time of trial.

[91] *See supra* note 87 & accompanying text.

[92] Although the psychological report is not included with the transcript of the motion-for-new-trial hearing, it is available elsewhere in the record.

Shaffer's report indicated that (1) Serdula suffered from bipolar mania resulting in sexual-behavior compulsions; (2) the behavior leading to his arrest was influenced by manic mood states and neuropsychological disinhibition; (3) Serdula experienced "grandiose delusion" during the process of planning and executing his crimes; and (4) in his manic state, there is a continuing compulsion to engage in his particular criminal conduct. But although the report described a mental illness resulting in compulsive criminal behavior, it did *not* identify any specific delusion as to a fact that Serdula had at the time of his criminal conduct that would have "justified" his behavior.[93] Furthermore, Shaffer specifically testified at the sentencing hearing that he did not conclude Serdula was laboring under any delusional compulsion at the time of his criminal conduct. Indeed, according to Shaffer, there was no evidence that Serdula was incapable of understanding the difference between right and wrong. Serdula's trial counsel, consistent with the foregoing testimony, testified at the motion-for-new-trial hearing that Serdula did not appear to have any delusional

---

[93] *See supra* note 87 & accompanying text. Serdula correctly notes that Shaffer's report indicated that his mental state would interfere with his ability to assist counsel. But as we have already explained, Serdula's mental state at the time of trial has no bearing on whether he could establish that he suffered from a delusional compulsion at the time he committed his crimes.

compulsions that would support an insanity defense. Trial counsel also discussed

Shaffer's report with him and believed that Shaffer agreed.

Given the foregoing testimony, Serdula has presented no evidence that he had

a viable delusional-compulsion defense.[94] Thus, trial counsel was not deficient in

presenting such a meritless defense, and Serdula cannot show that he was prejudiced

by his counsel's failure to do so because it would not have been successful.[95]

---

[94] *See Alvelo*, 290 Ga. at 612-13 (3) (holding that a jury rationally rejected an insanity defense when, although the defendant had a history of repeated hospitalizations in mental health facilities, was psychotic, and suffered from paranoid schizophrenia, a forensic psychologist testified that he saw no evidence that the defendant was delusional at the time of his crimes); *Martinez v. State,* 284 Ga. 138, 142 (4) (663 SE2d 675) (2008) (holding that the defendant's trial attorneys were not ineffective for choosing to forego a delusional-compulsion defense based on the defendant's post traumatic stress disorder when the defendant and his attorneys collectively agreed that it was highly unlikely that such a defense would succeed); *VanVoorhis*, 234 Ga. App. at 749-50 (holding that the trial court properly rejected a compulsive-delusion insanity defense when there was conflicting evidence as to exactly what delusion, *if any*, that the defendant had when she attacked her mother). *Cf. McElrath v. State*, ___ Ga. ___, Case No. S19A1361, 2020 WL 967013, at *3 (1) (b) (decided Feb. 28, 2020) (holding that the jury was authorized to find the defendant not guilty of malice murder by reason of insanity when there was evidence that, at the time he stabbed his mother, he suffered from a specific multifaceted delusion that she was poisoning him and that he was in imminent danger of death at the time he attacked her).

[95] *See Varner v. State*, 306 Ga. 726, 733 (3) (a) (832 SE2d 792) (2019) (holding that counsel was not ineffective for failing to raise meritless arguments that would have been rejected); *Cooper v. State*, 342 Ga. App. 351, 356 (4) (801 SE2d 589) (2017) ("[F]ailure to make a meritless or futile objection or motion cannot be

For all these reasons, we affirm Serdula's convictions.

*Judgment affirmed. Rickman and Brown, JJ., concur.*

---

evidence of ineffective assistance." (punctuation omitted)).